UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Tammy A. Mhanna and
Theresa L. Johnson,

       Plaintiffs,

v.

Metropolitan Council; and Officer Matt
Wilkinson, Officer Liam Pham, Officer
Peter Eshenaur, and Sergeant Chad Worden,
*in their individual and official capacities*,

       Defendants.

File No. 21-cv-1974 (ECT/DTS)

**OPINION AND ORDER**

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, Minneapolis, MN, attorney for Plaintiffs Tammy A. Mhanna and Theresa L. Johnson.

Aaron Mark Bostrom, Jason M. Hiveley, and Julia Kelly, Iverson Reuvers Condon, Bloomington, MN, attorneys for Defendants Metropolitan Council, Officers Matt Wilkinson, Officer Liam Pham, Officer Peter Eshenaur, and Sergeant Chad Worden.

---

Four Metro Transit police officers stopped Plaintiff Theresa Johnson's Dodge Durango on September 5, 2019, because the Durango matched the description of a get-away vehicle used by a shooting suspect. Johnson and her co-Plaintiff, Tammy Mhanna, a passenger in the Durango, had nothing to do with the shooting. They were just driving home from work. And it didn't take the officers long to determine that Johnson and Mhanna weren't who they were looking for. Before reaching that conclusion, however, officers drew their weapons, ordered both women out of the vehicle, handcuffed them, and detained Johnson in the back seat of one of the three squad cars on scene.

In this case against the four officers who conducted the stop and their employer, the Metropolitan Council, Johnson and Mhanna assert constitutional claims under § 1983 and a conversion claim under Minnesota law. Johnson and Mhanna together claim that officers violated the Fourth Amendment because they lacked reasonable suspicion to stop the vehicle and used excessive force to carry out the stop. Johnson individually claims that one of the officers violated the Fourth Amendment by stealing a $100 bill from her purse during the stop, and this claimed theft also is the basis for the conversion claim.

Defendants seek summary judgment, arguing they enjoy qualified immunity with respect to Plaintiffs' § 1983 claims and that Johnson's theft allegations lack trial-worthy factual support. The motion will be granted in part and denied in part. The short story is this: Officers had reasonable suspicion to stop Johnson's Durango, and reasonable grounds to draw their weapons and to handcuff Johnson and Mhanna. Though an officer diligently unhandcuffed Mhanna after determining the two women were not involved in the shooting, Johnson remained handcuffed and detained for several minutes longer. The unconstitutionality of leaving Johnson handcuffed during this time was clearly established before the stop. Johnson's theft claim is submissible, but just on a conversion theory—not under the Fourth Amendment. There is no basis for liability with respect to the Metropolitan Council.

I[1]

*The initial shots-fired report and response.*   On September 5, 2019, at around 3:57 p.m., Metro Transit Police Department dispatch broadcasted that shots had been fired at the Hamline Avenue light-rail station on University Avenue in St. Paul.   ECF Nos. 14-1 at 4; 14-5 at 9–12, 14; 14-6 at 2.   Sergeant Chad Worden and Officers Matt Wilkinson, Liam Pham, and Peter Eshenaur—all with the Metro Transit Police Department— responded to the report.   ECF Nos. 14-1 at 5–6; 14-2 at 5; 14-3 at 5–6; 14-4 at 4–6; 14-5 at 9–12, 14.   Officers Eshenaur and Pham arrived at the scene together in one vehicle.   ECF Nos. 14-1 at 4; 14-2 at 4–5.   Officer Wilkinson arrived with his K9 partner in a second car. ECF No. 14-3 at 4.   And Sergeant Worden arrived at the scene alone in a third vehicle. ECF Nos. 14-4 at 4; 14-5 at 14.

*Sergeant Worden discovers a cartridge case on the floor of a train car.*   After arriving, Sergeant Worden boarded the light rail train car in which the shooting had occurred and observed what he described to be "one shell casing lying on the floor of the train."   ECF No. 14-4 at 5; *see also* ECF No. 14-5 at 14.   Officer Wilkinson would note in his report that the cartridge case came from a .380 caliber firearm.   ECF No. 14-5 at 10.

*Witnesses describe the incident.*   Officers interviewed five witnesses, and the witnesses' descriptions of the shooting were similar: Two black males—one who had boarded the train and another on the platform—argued.   ECF No. 14-5 at 9–11, 13–14.

---

[1]      The facts are undisputed or described in a light most favorable to Plaintiffs.  Fed. R. Civ. P. 56(a).  Citations are to CM/ECF pagination (appearing at the top, right corner of each page) and not to a document's original pagination.

The male who was on the platform drew a handgun and fired one shot—perhaps after entering the train or perhaps while holding open the train's door—hitting the male on the train (with whom he had been arguing). *Id.* at 9, 11, 13–14. Both the shooter and the victim fled the scene. *Id.* at 10–11, 13–14.

*Witnesses describe the shooter.* Witnesses provided somewhat varying descriptions of the shooter. One described him as being approximately "20 years old with short dreads, wearing a red and yellow striped shirt and black pants." *Id.* at 10. A second eyewitness described the shooter as being five feet, six inches tall and "wearing a ball cap in reverse, baggy jeans, [and] yellow top." *Id.* at 11. A third witness described him as being "in his mid-20's wearing a yellow and white striped shirt." *Id.* at 13. And a fourth witness described him as "wearing a yellow and white striped shirt and tan pants with a white do-rag on his head." *Id.* at 14.

*Officers learn that the shooter may have fled the scene in a silver Dodge Durango.* As the Defendant officers were engaged in their on-scene investigative work or not long after, at least three of them received information regarding a vehicle—a silver Dodge Durango—that the shooter may have ridden in to depart the area. The three officers' descriptions of this information vary somewhat. In his deposition, Officer Eshenaur described learning at some point while he was on the scene or after he had been cleared to return to headquarters that the shooter may have been driven away from the scene by a female driver in a silver Dodge Durango. ECF No. 14-1 at 5–6. Officer Pham testified in his deposition that he received information that "an older silver Dodge Durango" had left the area and that "[i]t was a possible suspect vehicle." ECF No. 14-2 at 5. And Sergeant

Worden testified in his deposition that, at some point between the time he was standing in the train or sitting in his vehicle near the scene of the shooting, he heard over the radio "that there was an older silver colored Dodge Durango that possibly had contained the shooter or was involved in this somehow and that this vehicle had fled to the south from this scene." ECF No. 14-4 at 6. Sergeant Worden's deposition testimony is consistent with his incident report. There, he wrote that "[d]uring the initial incident, [he] heard officers say that there was a suspect vehicle involved that was an older [s]ilver colored Dodge Durango that had fled to the south." ECF No. 14-5 at 14.

*Sergeant Worden sees an older, silver Dodge Durango near the crime scene.* At 4:47 p.m., roughly fifty minutes after the initial report of the shooting, Sergeant Worden was in his squad car parked on Syndicate Avenue south of University Avenue, near the Hamline Avenue light-rail station. ECF Nos. 14-4 at 6; 14-5 at 14. At that time, he observed an older, silver-colored Dodge Durango exit the parking lot located at 450 Syndicate Avenue North and head south. ECF Nos. 14-4 at 6–7; 14-5 at 14; 14-7 at 9, 11. This parking lot is within one block east and one block south of the Hamline Avenue light rail station. ECF No. 14-9.

*Sergeant Worden follows and stops the Durango.* Sergeant Worden followed the vehicle and radioed the vehicle's description and license plate number to dispatch. ECF Nos. 14-4 at 6; 14-5 at 14. The Durango's "windows were very darkly tinted," leaving Sergeant Worden unable to see into the vehicle or observe the vehicle's occupants at that time. ECF No. 14-4 at 9. Sergeant Worden continued to follow the vehicle, opting not to stop it until other officers arrived and were able to assist. ECF No. 14-4 at 7. In his

deposition, Officer Worden testified: "I wasn't going to be in any hurry to stop the vehicle because I was going to wait for my partners to, you know, get there so they could help me out." *Id.* Around or just after 5:00 p.m., the Durango came to a stop on Davern Street just south of West Seventh Street in the Highland Park area of St. Paul. ECF Nos. 20-6 ("Worden Vid. Front") at 17:01; 14-4 at 7; 14-5 at 14; 14-6 at 3. At that point, Sergeant Worden parked his vehicle behind the Durango and activated his lights. Worden Vid. Front at 17:01:45; ECF Nos. 14-4 at 7; 14-5 at 14.

*Other officers arrive, and Plaintiffs are ordered out of the vehicle and handcuffed.* Officers Eshenaur and Pham arrived in their squad car less than one minute later. Worden Vid. Rear at 17:02:27; ECF Nos. 20-5 ("Eshenaur Vid. Front") at 17:02:27; 14-2 at 6. Sergeant Worden and Officers Eshenaur and Pham pointed their firearms at the Durango while Officer Eshenaur ordered the driver, Plaintiff Johnson, to drop her keys out the driver's window, exit the vehicle, and walk backwards toward the officers with her hands up. Worden Vid. Front at 17:02:39–03:15; Eshenaur Vid. Front at 17:02:39–03:15; ECF Nos. 14-7 at 7; 14-8 at 7; 14-5 at 11. Johnson followed the commands. ECF Nos. 14-8 at 7, 13–14; 14-5 at 11. Officer Pham then handcuffed Johnson, performed a pat-down search, and placed her in the back seat of Eshenaur and his squad car. ECF Nos. 20-5 ("Eshenaur Vid. Rear") at 17:04:30; 14-2 at 6; 14-8 at 7; 14-5 at 11. Sergeant Worden then gave similar instructions to the passenger, Plaintiff Mhanna. ECF Nos. 14-4 at 8; 14-5 at 14–15. Mhanna walked toward Sergeant Worden facing him. Worden Vid. Front at 17:04:08–17; ECF No. 14-4 at 8. Sergeant Worden then placed Mhanna in handcuffs. ECF

Nos. 14-4 at 8; 14-7 at 7.   It was around this time—or about 5:04 p.m.—that Officer Wilkinson arrived.   Worden Vid. Rear at 17:04:20; ECF No. 14-3 at 10.

*Officers inspect the Durango and find nothing to connect Johnson or Mhanna to the shooting.*   Soon after Johnson and Mhanna were handcuffed, Officers Eshenaur and Wilkinson approached the Durango with their firearms drawn.   Eshenaur Vid. Front at 17:04:43; Worden Vid. Front at 17:04:45; ECF Nos. 14-3 at 8; 14-1 at 7.   Officers Eshenaur and Wilkinson inspected the vehicle, examining its interior through the vehicle's windows and doors.   Eshenaur Vid. Front at 17:04:54–5:00.   The officers opened some of the vehicle's doors to inspect the vehicle.   *Id.* at 17:05:01–10.   The officers found nothing in the Durango related to the shooting or that aroused their suspicion that Johnson or Mhanna might have been connected to the shooting.   *Id.* at 17:05:01–50; Worden Vid. Front at 17:05:01–50; ECF Nos. 14-3 at 8; 14-5 at 11–12.

*Officers explain the reason for the stop, and Plaintiffs deny any involvement in the shooting.*   Officer Eshenaur explained to Johnson that a vehicle with a description matching her Durango had been involved in a shooting at the Hamline Station.   Eshenaur Vid. Rear at 17:05:30–6:02.   Johnson volunteered that she had been at work all day, was the registered owner of the Durango, and that her purse was in the Durango and contained her driver's license.   *Id.* at 17:05:38–06:13; ECF Nos. 14-8 at 7; 14-1 at 9.   During this same time, Sergeant Worden spoke with Mhanna about the shooting and the possible involvement of a Durango similar to Johnson's.   ECF Nos. 14-7 at 7; 14-5 at 15.   Mhanna confirmed that both women were at work all day and that Johnson was giving Mhanna a ride home.   ECF No. 14-7 at 7.

*Mhanna is unhandcuffed, but Johnson remains handcuffed.*  At that point, Mhanna was unhandcuffed and told she was free to leave, but Johnson remained handcuffed in the back seat of Eshenaur and Pham's squad car.  Worden Vid. Front at 17:06:59; ECF Nos. 14-7 at 7; 14-4 at 10; 14-5 at 15.  Johnson asked whether the handcuffs were "really necessary."  Eshenaur Vid. Rear at 17:06:42.  Officer Eshenaur answered that they were and told Johnson that she was "detained."  *Id.* at 17:06:44; ECF 14-1 at 10.

*Officer Pham retrieves Johnson's purse from the Durango to obtain and check her drivers' license.*  With Johnson still handcuffed in the squad car's back seat, Officer Pham retrieved her purse from the Durango.  Eshenaur Vid. Front at 17:07:24; Worden Vid. Front at 17:07:24; ECF No. 14-2 at 10.  Officer Pham approached the Durango from the driver's side, reached his right arm in through the rear, driver's side door, and retrieved the purse, evidently from behind the driver's seat.  Worden Vid. Front at 17:07:19.  While standing next to the rear, driver's side door, and, in plain view of Officer Eshenaur, Officer Pham examined the purse's interior.  *Id.* at 17:07:24–34; *see also* ECF No. 14-2 at 10.  During this time, Officer Pham, who was wearing short sleeves, did not place either of his hands in any of his pockets.  Worden Vid. Front at 17:07:24–34.  Officer Pham walked back to the squad car in which Johnson was being held with the purse in his left hand.  *Id.* at 17:07:34–39.  Videos from the vehicles' front-facing cameras show that Officer Pham's hands were clearly visible and, except for the purse, empty.  *Id.*; Eshenaur Vid. Front at 17:07:34–39.

*Officer Pham runs Johnson's license and receives a "state records hit."*  After returning to his vehicle, Officer Pham entered the front, passenger-side door and from that

position entered Johnson's driver's license information through the squad car's computer into a Minnesota Driver and Vehicle Services database. ECF No. 14-2 at 7, 10–11. The system initially verified that Johnson's driver's "license status" was "valid" and that she was "clear" according to the National Crime Information Center (or "NCIC"). Eshenaur Vid. Rear at 17:08:38–45. However, the system reported a "state records hit." *Id.* at 17:08:40; ECF Nos. 14-2 at 8; 14-1 at 9. According to Officers Eshenaur and Pham, a "state records hit" occurs when the database finds a match between the person entered and a person with the same name, alias, or date of birth who is the subject of a warrant or who has some other indicating issue. ECF Nos. 14-1 at 9; 14-2 at 8. Officer Pham told Officer Eshenaur about the state records hit, and in response to Officer Eshenaur's inquiry, Johnson denied being the subject of any warrant and stated she had not received a traffic citation in "twenty years." Eshenaur Vid. Rear at 17:09:18–31; ECF Nos. 14-1 at 9; 14-8 at 7–8. Officer Pham ran the same search a second time and received the same result, including the "state records hit." Eshenaur Vid. Rear at 17:10:09–20.

*With Johnson still handcuffed in the squad car's rear seat, Officer Pham returns Johnson's purse to the Durango.* After running Johnson's license, Officer Pham exited his squad car holding Johnson's purse in his right hand and walked toward the Durango. Worden Vid. Front at 17:10:50. While standing near the rear, driver's-side door, Officer Pham paused to speak with Officer Eshenaur. *Id.* at 17:10:56. The two spoke for roughly ten seconds, though the record does not reveal the content of this conversation. *Id.* at 17:10:56–11:06. During the conversation, Officer Pham held Johnson's purse in his left hand and looked down into the purse. *Id.* at 17:10:56–11:06; Eshenaur Vid. Front at

17:10:56–11:06.  Officer Eshenaur also was looking at the purse while Officer Pham held it.  Worden Vid. Front at 17:10:56–11:06.  Officer Pham then transferred the purse from his left hand to his right hand, placed the purse back in the Durango behind the driver's seat, and closed the rear, driver's-side door.  *Id.* at 17:11:17–24.  Officer Pham walked back toward the squad cars, and dash-camera video from two of the vehicles shows that his hands were both visible and empty after he placed Johnson's purse in the back seat of the Durango.  *Id.* at 17:11:29–40; Eshenaur Vid. Front at 17:11:29–40.

*Johnson is unhandcuffed and permitted to leave.*  At this time, officers allowed Johnson to exit the squad car and removed her handcuffs.  Eshenaur Vid. Rear at 17:12:11–53; ECF Nos. 14-2 at 13; 14-5 at 11.  Sergeant Worden explained why the stop occurred and told Johnson she was free to go.  Eshenaur Vid. Rear at 17:12:11–13:36; ECF No. 14-5 at 11.  Mhanna joined the conversation, and both women were visibly upset and frustrated with the Officers.  Eshenaur Vid. Rear at 17:13:06–36; ECF Nos. 14-8 at 15 ("Me and Tammy were very upset, and we were basically yelling at them, to be honest."); 14-5 at 15 ("[B]oth females were very angry with officers.").  Sergeant Worden gave Plaintiffs his card, and the officers left the scene.  Eshenaur Vid. Front at 17:15:55; Worden Vid. Front at 17:16:00; ECF No. 14-8 at 15.

*Johnson discovers that she is missing a $100 bill.*  When Johnson got back in her Durango, and before driving away from the scene, she discovered that a $100 bill was missing from her wallet.  ECF No. 14-8 at 12–13.  (It doesn't matter to Defendants' motion, but the record does not reflect that Johnson raised the issue of the missing $100 bill with the officers at that time.)

*Plaintiffs file this case.*  Plaintiffs filed their Complaint in this case in September 2021, naming the four officers in their individual and official capacities and their employer, the Metropolitan Council.  ECF No. 1 at 1 (caption); *see also id.* ¶¶ 6, 7.[2]  The Complaint includes six causes of action: a § 1983 claim in which Plaintiffs allege that Defendants lacked reasonable suspicion to conduct the traffic stop, unlawfully handcuffed Plaintiffs, and unlawfully seized $100 from Johnson (Count 1); claims under Minnesota common law for assault (Count 2), battery (Count 3), false arrest or imprisonment (Count 4), and negligence (Count 5), all stemming from the conduct of the traffic stop; and a conversion claim under Minnesota common law (Count 6) arising from the alleged theft of $100 from Johnson.  *See id.* ¶¶ 19–46.  For relief, Plaintiffs seek compensatory and punitive damages and reasonable attorney's fees under 42 U.S.C. § 1988.  *Id.* at 8.

## II

It helps to begin by describing the parties' summary-judgment positions.  In their opening brief, Defendants argued that summary judgment should be entered against Plaintiffs' § 1983 constitutional claims on the basis of qualified immunity.  Specifically, Defendants argued that the officers had reasonable suspicion to stop the Durango under *Terry v. Ohio*, 392 U.S. 1 (1968), that their subsequent actions complied with the constitutional limitations on a *Terry* stop, and that no reasonable jury could find that Officer Pham stole Johnson's money.  Defs.' Mem. in Supp. [ECF No. 13] at 12–29.  If there was

---

[2]   The case's CM/ECF docket does not specify whether Officer Eshenaur is being sued in his individual capacity, official capacity, or both.  This is an oversight.  The Complaint's caption identifies all Defendant officers—including Officer Eshenaur—as being sued in their individual and official capacities.  ECF No. 1 at 1.

a constitutional violation, Defendants argued that they had arguable reasonable suspicion to stop the Durango and that they violated no other clearly established constitutional right. *See id.* at 18–19.  With respect to Plaintiffs' state-law claims, Defendants argued that they were entitled to official and vicarious official immunity under Minnesota law and that, regardless, the state-law claims fail on their merits.  *Id.* at 29–33.

Plaintiffs' response brief narrowed the issues.  Regarding their § 1983 claims, Plaintiffs argued that the stop was not supported by reasonable suspicion and therefore violated the Fourth Amendment's prohibition against unreasonable searches and seizures. Pls.' Mem. in Opp'n [ECF No. 19] at 6–10.  Plaintiffs argued separately that Sergeant Worden's handcuffing of Mhanna and Officer Pham's handcuffing of Johnson amounted to excessive force.  *Id.* at 10–13.  And Plaintiffs argued that there is a fact dispute as to whether Officer Pham seized a $100 bill from Johnson's purse and that, if proven, this seizure violated the Fourth Amendment.  *Id.* at 13–15.  Plaintiffs did not defend their official-capacity claims against the officers or a claim against the Metropolitan Council under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).  Regarding their state-law claims, Plaintiffs defended only the conversion claim, arguing that the claim is trial-worthy as to Officer Pham and the Metropolitan Council.  Plaintiffs abandoned their state law claims for assault (Count 2), battery (Count 3), false arrest or imprisonment (Count 4), and negligence (Count 5).  *See City of Kennett v. Env't Prot. Agency*, 887 F.3d 424, 430 (8th Cir. 2018) ("'[F]ailure to oppose a basis for summary judgment constitutes a waiver of that argument.'" (quoting *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009))).  Left for decision, then, are Plaintiffs' § 1983 Fourth

Amendment claims against the officers in their individual capacities and Johnson's conversion claim against Officer Pham and the Metropolitan Council.

### III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted).

### IV

In determining whether individual officers have qualified immunity, two questions are answered: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional . . . right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (citations omitted); *see also Watson v. Boyd*, 2 F.4th 1106, 1109 (8th Cir. 2021). Courts may consider the questions in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  A § 1983 plaintiff can defeat a claim of qualified immunity only if the answer to both questions is yes.  *Id.*  "Qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'"  *Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 991 (8th Cir. 2020) (quoting *Kisela v. Hughes*,  --- U.S. ---, 138 S. Ct. 1148,

1152 (2018)), *cert. denied sub nom. Kong v. City of Burnsville, Minn.*, --- U.S. ---, 141 S.

Ct. 2839 (2021).  If the material facts are not genuinely disputed, then the constitutionality

of an officer's conduct is a question of law.  *Thompson v. Reuting*, 968 F.2d 756, 759 (8th

Cir. 1992); *see also Pollreis v. Marzolf*, --- F.4th ---, No. 21-3267, 2023 WL 3111159, at

*4 n.2 (8th Cir. Apr. 27, 2023); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

A

Plaintiffs' first § 1983 claim is that the officer Defendants lacked reasonable

suspicion to support the traffic stop and ensuing investigation and therefore violated

Plaintiffs' Fourth Amendment rights against unreasonable searches and seizures.  *See* Pls.'

Mem. in Opp'n at 6–10.  The general standards governing this question are familiar:

> The Fourth Amendment protects against "unreasonable . . .
> seizures." U.S. Const. amend IV.  The Supreme Court has held
> that "the police can stop and briefly detain a person for
> investigative purposes if the officer has reasonable suspicion
> supported by articulable facts that criminal activity 'may be
> afoot,' even if the officer lacks probable cause." *United States
> v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392
> U.S. 1, 30 (1968)).   "In making reasonable-suspicion
> determinations, reviewing courts 'must look at the 'totality of
> the circumstances' of each case to see whether the detaining
> officer has a 'particularized and objective basis' for suspecting
> legal wrongdoing.'" *United States v. Martinez-Cortes*, 566
> F.3d 767, 769 (8th Cir. 2009) (quoting *United States v. Arvizu*,
> 534 U.S. 266, 273 (2002)).  An officer's observations must be
> viewed "as a whole, rather than as discrete and disconnected
> occurrences." *United States v. Poitier*, 818 F.2d 679, 683 (8th
> Cir. 1987).
>
> "Factors that may reasonably lead an experienced officer to
> investigate include time of day or night, location of the suspect
> parties, and the parties' behavior when they become aware of
> the officer's presence." *United States v. Dawdy*, 46 F.3d 1427,
> 1429 (8th Cir. 1995).  We have said before that "a person's

> temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citing *United States v. Juvenile TK*, 134 F.3d 899, 903–04 (8th Cir. 1998)).

*Pollreis v. Marzolf*, 9 F4th 737, 743–44 (8th Cir. 2021).

Our Eighth Circuit Court of Appeals has applied these general standards to determine whether an incomplete description of a vehicle, among other factors, gave officers reasonable suspicion to conduct a *Terry* stop. Consider *United States v. Mosley*, 878 F.3d 246 (8th Cir. 2017). There, two individuals robbed a bank. *Id.* at 250. A witness driving nearby "reported that a gray/silver Ford Taurus was in the vicinity of the bank and was the only vehicle leaving the area in the moments after the robbery." *Id.* "When the witness got close enough to see inside the gray Taurus, he reported that he could only see one woman in the car, whereas he had seen two men running from the bank." *Id.* Roughly eight minutes after the robbery, a nearby law enforcement officer who had "received a radio dispatch that a gray Ford Taurus may have been involved in a bank robbery and was seen heading southbound" initiated a stop of a gray Ford Taurus "traveling in the direction indicated by the witness." *Id.* After some back-and-forth with the vehicle's female driver—including at one point telling her she could leave—the officer searched the vehicle's trunk. *Id.* "Inside and about four minutes after [the officer] initiated the stop, officers found [the defendants], along with cash and masks." *Id.* The defendants argued that the vehicle stop was not supported by reasonable suspicion. *Id.* at 251. Disagreeing, the Eighth Circuit observed that its "precedent rejects any requirement that there must be a definite or certain connection to the criminal activity to support reasonable suspicion."

*Id.* at 252. Instead, the court explained, what matters is "the totality of the circumstances." *Id.* In deciding that reasonable suspicion supported the stop, the *Mosley* court specifically considered the similarity between the stopped vehicle and the vehicle allegedly involved in the offense, the "'temporal and physical proximity of the [vehicle] to the crime,'" and the presence or absence of a match between witnesses' descriptions of the perpetrators and the vehicle's occupants. *Id.*

Other cases reflect a similar approach. *See, e.g.*, *United States v. Daniel*, 887 F.3d 350, 354–55 (8th Cir. 2018) (finding officers had reasonable suspicion based on matching vehicle description, geographic and temporal proximity of the vehicle to the crime scene, and late-night timing of the stop); *United States v. Vinson*, 805 F.3d 1150, 1151–52 (8th Cir. 2015) (finding officer had reasonable suspicion based on matching vehicle description and geographic and temporal proximity of the vehicle to the crime scene); *United States v. Roberts*, 787 F.3d 1204, 1209–10 (8th Cir. 2015) (finding officer had reasonable suspicion based on matching vehicle description and the "close temporal and physical proximity of the car to the crime"); *United States v. Witt*, 494 Fed. App'x 713, 716 (8th Cir. 2012) (finding officers had reasonable suspicion based on generally matching vehicle description, low-traffic rural area in which the stop occurred, and one-hour temporal proximity between crime and stop); *United States v. Juvenile TK*, 134 F.3d 899, 900–04 (8th Cir. 1998) ("Thus, in light of the totality of the circumstances in the instant case and, in particular, the short distance between the location of the stop and the crime scene, the short period of time between the stop and the officers' reception of the second dispatch, the time of the stop, and the allegations of conduct that was clearly criminal, we hold that there was reasonable

suspicion to support the investigative stop."); *Thompson*, 968 F.2d at 757–60 (finding officer lacked reasonable suspicion because "[a] report that a particular car is 'suspicious' simply does not indicate whether its occupants may be engaged in criminal activity").

Applying these rules to the undisputed material facts here shows that the officers had reasonable suspicion to stop Johnson's Durango.  Sergeant Worden described hearing over the radio "that there was an older silver-colored Dodge Durango that possibly had contained the shooter."  ECF No. 14-4 at 6.  Judged against the Eighth Circuit cases cited above, this description of the vehicle is reasonably particular.  It includes the suspect vehicle's make (or brand), model, color, and the fact that it was older.  Johnson's Durango matched this description.  Johnson's Durango was a 2003 model year, manufactured some sixteen years before the incident.  ECF No. 14-8 at 11.  It could reasonably be described as silver in color.  ECF No. 14-10.[3]  Sergeant Worden first saw Johnson's Durango in close geographic proximity to the crime scene.  The parking lot from which Johnson's Durango exited at 450 Syndicate Avenue North is less than one block to the east and less than one block to the south of the Hamline Avenue light-rail station.  In his deposition, Sergeant Worden described this location as being "within a short walking distance of the shooting."  ECF No. 14-4 at 7.  In addition to the close geographic proximity to the crime scene, the location where Sergeant Worden first saw Johnson's Durango was consistent with the

---

[3]     Though Johnson described the vehicle's color as "grey," she also described the actual get-away vehicle's color as "grey."  ECF No. 14-8 at 11.  Regardless, the record includes color photographs of both vehicles, and there is no serious question that a reasonable person could describe them as sharing either a grey or silver color.  ECF No. 14-10.

report Sergeant Worden received that the possible get-away "vehicle had fled south from this scene." ECF No. 14-4 at 6. Sergeant Worden first spotted Johnson's Durango roughly fifty minutes after the initial report of the shooting and closer in time to when officers learned of the possible get-away vehicle's description. *Id.* This time gap is longer than the time gaps in several of the above-cited cases. But in view of all the other facts surrounding Sergeant Worden's sighting of the vehicle, the interval is not so great as to undermine Sergeant Worden's reasonable suspicion.[4]  "An officer exercising 'reasonable caution' would believe it appropriate to conduct an investigatory stop of the [Durango]." *Daniel*, 887 F.3d at 355 (citing *Terry*, 392 U.S. at 21–22).

Plaintiffs argue that Sergeant Worden did not have reasonable suspicion to stop them. Plaintiffs cite a series of mostly Eighth Circuit cases in which the time gap between the crime's commission and the vehicle's identification or stop were shorter than the roughly fifty-minute interval here. Pls.' Mem. in Opp'n at 7–9. Based on these cases, Plaintiffs argue that the Eighth Circuit "permits traffic stops based on a generic vehicle description but only if the vehicle is located in close geographic **and** temporal proximity to the scene of the crime." *Id.* at 9. Plaintiffs also point out that Sergeant Worden "spotted Ms. Johnson's Dodge Durango during weekday rush-hour traffic in a busy and densely populated area of St. Paul." *Id.* at 10. "Based on these facts, [Plaintiffs argue that] a

---

[4]      As described in Part I, above, Sergeant Worden followed the Durango for some time, deciding not to stop it until other officers arrived and were able to assist. ECF No. 14-4 at 7. Plaintiffs do not argue that this decision, the length of time Sergeant Worden followed the Durango, whatever he may have learned from querying the Durango's license plate, or anything else that occurred during that time shows the absence of reasonable suspicion.

reasonable jury can conclude that the requirement of 'geographic and temporal proximity' was not satisfied in this case, thereby raising a genuine issue of fact for trial on the constitutional element of reasonable suspicion." *Id.*

These arguments are not persuasive. Plaintiffs' argument that close temporal proximity is a necessary predicate to finding reasonable suspicion conflicts with the Eighth Circuit's totality-of-the-circumstances approach. By its nature, the totality-of-the-circumstances test means that, depending on the case, a wide variety of considerations might factor into determining whether officers had reasonable suspicion to initiate and conduct a *Terry* stop of a vehicle. Understanding the Eighth Circuit to *require* the presence of one or another factor to justify reasonable suspicion in any particular type of case would depart from that more flexible, case-specific approach. *See United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (noting that the totality-of-the-circumstances test does not examine "each factor in isolation from the rest" and "'precludes this sort of divide-and-conquer analysis'" (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002))). Consistent with this understanding—and contrary to Plaintiffs' argument—the Eighth Circuit has held in one case that officers possessed reasonable suspicion to stop a vehicle somewhat generically described as a "dark green or black station wagon" "approximately 50 to 60 miles" from the crime scene and "about one hour after" the crime's commission. *Witt*, 494 Fed. App'x at 715–716.[5] No doubt Plaintiffs' description of the Durango's

---

[5] To be clear, the point in citing *Witt* isn't that stops supported with one or more of *Witt*'s facts will always support a finding of reasonable suspicion. The point is that the Eighth Circuit requires the close and careful consideration of all relevant facts specific to a particular case to determine whether a *Terry* stop was supported by reasonable suspicion.

sighting as occurring "during weekday rush-hour traffic in a busy and densely populated area of St. Paul," Pls.' Mem. in Opp'n at 10, is generally accurate. However, the record includes no testimony or other information or material describing whether the particular area of Syndicate Avenue North where Sergeant Worden observed Johnson's Durango was busy (or not) at that time. Finally, Plaintiffs' argument that they have identified "a genuine issue of fact for trial on the constitutional element of reasonable suspicion" is flawed because the material facts are not genuinely disputed. In that circumstance, as noted earlier, the issue of whether an officer has a reasonable suspicion to conduct a *Terry* stop is a question of law. *Thompson*, 968 F.2d at 759.

The bottom line here is that the totality of the circumstances—the reasonable particularity of the possible get-away vehicle's description, the identity between that description and Johnson's vehicle, the very close geographic proximity between the crime scene and where Johnson's Durango was first seen by Sergeant Worden, and the fifty-minute gap between the crime and the vehicle's sighting—establish as a matter of law that there was reasonable suspicion to support the investigative stop of the Durango. In other words, with respect to the initial *Terry* stop of the Durango, the facts shown by Plaintiffs do not make out a violation of a constitutional right. If that were not correct, the same cases cited above show that the officers had arguable reasonable suspicion to stop the Durango—a point Plaintiffs have not earnestly addressed.

---

It would be a mistake, therefore, to think that the absence or presence of any one fact in a particular case would necessarily rule out or establish the presence of reasonable suspicion.

B

Plaintiffs' second § 1983 claim is that Sergeant Worden's handcuffing of Mhanna and Officer Pham's handcuffing of Johnson amounted to the use of excessive force, violating Plaintiffs' Fourth Amendment rights against unreasonable searches and seizures. *See* Pls.' Mem. in Opp'n at 6–10. Plaintiffs' position is that the officers had "no legitimate justification" at any point in the investigative stop for "using any degree of force against" them. Pls.' Mem. in Opp'n at 13. Plaintiffs argue that the officers "had no reason to fear for their safety or to believe that the Plaintiffs were armed or dangerous, especially after they were frisked for weapons." *Id.* Therefore, Plaintiffs argue, Sergeant Worden and Officer Pham violated their Fourth Amendment rights by handcuffing them.

Plaintiffs' argument implicates what has been referred to as "the second *Terry* question"—that is, whether the manner in which the "officers conducted the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *Haynes v. Minnehan*, 14 F.4th 830, 835 (8th Cir. 2021) (cleaned up). Several settled rules guide the analysis of this question. "An officer's use of force violates the Fourth Amendment if it was 'objectively unreasonable.'" *Pollreis*, 9 F.4th at 747 (quoting *Graham v. Connor*, 490 U.S. 386, 394–96 (1989)). "Objective unreasonableness is 'judged from the perspective of a reasonable officer on the scene,' in light of 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Officers may use force in carrying out a *Terry* stop. "It is well established

that officers may reasonably draw weapons during a *Terry* stop when the defendant is suspected of carrying a weapon—even if the defendant is otherwise cooperative." *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022).   "Likewise, police officers may reasonably handcuff a suspect in the course of a *Terry* stop to protect officer safety and maintain the status quo." *Irvin v. Richardson*, 20 F.4th 1199, 1206 (8th Cir. 2021).   As the Eighth Circuit has explained, however:

> [B]ecause handcuffs constitute "greater than a de minimus intrusion," their use "requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in [believing] that the action taken was appropriate." [*El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011)] (first alteration in original) (quoting *Lundstrom v. Romero*, 616 F.3d 1108, 1122–23 (10th Cir. 2010)).   In particular, *Terry* "requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)).   We have already held that handcuffing "absent any concern for safety" violates the second *Terry* prong. *Id.* at 460 (citing *Manzanares v. Higdon*, 575 F.3d 1135, 1150 (10th Cir. 2009)).

*Haynes*, 14 F.4th at 835 (footnote omitted).   Officers must act with reasonable diligence to "'pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly.'"   *Irvin*, 20 F.4th at 1207 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Here, the undisputed material facts show that, while safety concerns gave the officers reasonable justification to draw their weapons and handcuff Plaintiffs for a time, no safety concern or other justification existed to keep Johnson handcuffed after officers cleared the Durango and after Sergeant Worden unhandcuffed Mhanna.   The reason for the

stop initially justified officers in drawing their weapons (an action Plaintiffs do not challenge) and handcuffing Plaintiffs. Officers possessed reasonable suspicion that the Durango was the get-away vehicle used by the Hamline Avenue light-rail station shooter. In other words, the crime involved a firearm's use, and officers had reasonable suspicion to believe either that the shooter may have been present in the Durango, perhaps hidden from plain view and armed, or that a firearm used by the shooter may have been in the Durango and perhaps available to its occupants. Consistent with that concern, (1) officers drew their weapons and ordered Plaintiffs to exit the vehicle one at a time (again, a use of force that Plaintiffs do not argue was independently excessive); (2) Officer Pham handcuffed Johnson and Sergeant Worden handcuffed Mhanna after Johnson and Mhanna each had exited the Durango to maintain the status quo; and (3) officers drew their weapons as they inspected the Durango to determine whether the shooter was present (also a use of force that Plaintiffs do not argue was independently excessive). Just after officers cleared the Durango, Sergeant Worden explained the reason for the stop to Mhanna. She confirmed that she and Johnson had been at work all day and that she was getting a ride home from Johnson. At that point—roughly one minute and nine seconds after officers had cleared the Durango—Sergeant Worden acted with reasonable diligence and removed Mhanna's handcuffs. Worden Vid. Front at 17:06:59. In his deposition, Sergeant Worden confirmed that when he decided to remove Mhanna's handcuffs, he was "satisfied that this Dodge Durango was not involved in the shooting." ECF No. 14-4 at 15.[6] Johnson,

---

[6] Mhanna does not address—and is therefore understood not to argue—that the roughly one-minute-and-nine-second interval between when officers cleared the Durango

however, remained handcuffed in the backseat of Officer Eshenaur and Officer Pham's squad car, and she would remain handcuffed for another roughly six minutes. Eshenaur Vid. Rear at 17:06:59–17:12:47.

Defendants have failed to identify facts supporting an objective safety concern that might justify leaving Johnson handcuffed during this time, *see Haynes*, 14 F.4th at 836, and the undisputed material facts show that no such concern was present. By that time, officers knew there was no weapon or other evidence in the Durango connecting it, Johnson, or Mhanna to the shooting. No weapon or other crime-connecting evidence had been found in the pat-down or visual cursory search of either Mhanna or Johnson. Officers controlled the scene. There were four of them as compared with Mhanna and Johnson, and Mhanna and Johnson had been compliant and cooperative throughout the stop. The stop occurred in daylight, and no outside conditions existed that would have added to the stop's risks or challenges. Yet Johnson remained handcuffed.

Defendants argue that it was reasonable to leave Johnson handcuffed during this time to "conduct[] additional investigation on [Johnson] to ensure she was not the getaway driver and that the Durango was not the suspect vehicle." Defs.' Mem. in Supp. at 27. This is not persuasive. By that time, officers had no reason to think Johnson was connected to the crime. Discovery confirmed this. No officer testified that, after the Durango had been

---

and Sergeant Worden unhandcuffed her either amounted to an unreasonable use of force or showed that Officer Worden did not act with reasonable diligence in removing the handcuffs and releasing her once the Durango had been cleared. Regardless, the undisputed material facts show that Sergeant Worden acted with reasonable diligence in unhandcuffing Mhanna.

inspected and cleared, he remained concerned that the Durango, Johnson, or Mhanna may have been involved in the shooting. Officer Eshenaur testified that the focus of the stop and the Durango's inspection was to determine whether a firearm was present and that "[n]o firearm was located." ECF No. 14-1 at 8–9. Officer Pham justified the decision to handcuff Johnson based only on the involvement of weapons in the crime being investigated. ECF No. 14-2 at 7. In other words, as far as Officers Eshenaur and Pham were concerned, the justification for the stop—much less the need for handcuffing Johnson—ended when no firearms were found. As noted, Sergeant Worden testified that when he decided to remove Mhanna's handcuffs, he was "satisfied that this Dodge Durango was not involved in the shooting." ECF No. 14-4 at 15. Sergeant Worden also testified that he was unaware why Johnson remained handcuffed. *Id.* at 11 ("Q: At the point when you took off Ms. Mhanna's cuffs and you told her that she could leave at that point, did you instruct Officers Pham and Eshenaur to release Ms. Johnson? A: I think that at that point, I remember walking over there to their car to see what was going on and why she was still detained at that time, because I didn't know -- like I said, I was just trying to figure out why she was still in custody at that point."). The stop, in other words, dispelled the reasonable suspicion that justified it. *See United States v. Patterson*, 25 F.4th 123, 138 (2d Cir. 2022) (recognizing that "the very purpose of a *Terry* stop is to confirm *or dispel* the reasonable suspicion that justifies the stop in the first place" (quotation omitted)).

Regardless, if there were some reasonable basis for officers to continue to think that Johnson might possibly have been involved in the shooting or some other crime, that does not answer why it was appropriate to leave Johnson in handcuffs as that additional

investigation occurred.  That is a different question.  Defendants seem to suggest that it was appropriate for Johnson to remain handcuffed while "Officer Pham retrieved [Johnson's] purse and used Johnson's driver's license to manually input her information into the computer system."  Defs.' Mem. in Supp. at 27.  This is not correct.  "Questions about 'identity are a routine and accepted part of many *Terry* stops[,]'" but it remains the presence of an objective safety concern, not the need to answer identity questions, that is necessary to justify handcuffing.  *Haynes*, 14 F.4th at 835–36 n.4.[7]  Defendants also argue that the roughly six-minute interval during which Johnson remained handcuffed "was extremely minor" and "brief," implying that the interval was too short to establish a Fourth Amendment violation.  Not so.  *Id.* at 836–37 (holding that handcuffing of five minutes violated the plaintiff's Fourth Amendment rights).

The final question is whether "case law would have fairly notified every reasonable officer in [Officer Pham's] shoes that [his] conduct would violate the Constitution."  *Id.* at 837 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  I understand the Eighth Circuit to have answered this question "yes" in *Haynes*.  There, the court explained:

> More than six years before [the defendant officer] Steinkamp handcuffed [the plaintiff] Haynes, we said that it was "well established that if suspects are cooperative and officers have no objective concerns for safety, the officers may not use intrusive tactics such as handcuffing absent any extraordinary circumstances." *El-Ghazzawy*, 636 F.3d at 460.  We concluded that "the prior case law provided fair warning to [an officer] at the time of the incident" that a reasonable officer in her place

---

[7]     Defendants do not argue the point, but the "state records hit" returned on Johnson's license could not have justified leaving her handcuffed.  That report occurred after officers had cleared the Durango and confirmed the absence of weapons—*i.e.*, when there were no objective safety concerns.

"could not have believed it was lawful to handcuff and frisk a suspect absent any concern for safety." *Id.* And even earlier, we rejected an argument that reasonable suspicion justified handcuffing a suspect after a frisk confirmed that the suspect lacked a weapon or contraband. [*United States v.*] *Tovar-Valdivia*, 193 F.3d [1025,] 1028 n.1 [(8th Cir. 1999)]; *Manzanares* [*v. Higdon*, 575 F.3d [1135,] 1150 [(10th Cir. 2009)] ("[A]ny reasonable officer would understand that it is unconstitutional to handcuff someone absent probable cause or an articulable basis to suspect a threat to officer safety combined with reasonable suspicion.").

*Id.* at 837. Defendants' summary-judgment motion will therefore be denied to the extent it concerns Officer Pham and the decision to leave Johnson handcuffed after officers cleared the Durango and after Sergeant Worden unhandcuffed Mhanna.[8]

C

The final § 1983 theory is Johnson's claim that Officer Pham violated her Fourth Amendment right against unreasonable seizures by stealing the $100 bill from Johnson's purse. In her deposition, Johnson testified that she had a $100 bill in her wallet, that she had kept the bill in a separate pocket in her wallet "for like two months" because she was intending to give it to her niece as a graduation present, that she saw the bill in her wallet on the day of the stop, and that she noticed it was missing immediately after she returned to the Durango following the stop. ECF No. 14-8 at 12–13. Johnson asserts this claim

---

[8] The only argument Plaintiffs advanced in their opposition brief was that their handcuffing was unconstitutional from the start. *See* Pls.' Mem. in Opp'n at 10–12. Plaintiffs did not address the possibility that, while their original handcuffing may have been constitutional, the decision to keep them handcuffed after a certain point was not. In any event, Johnson's assertion that she was handcuffed unconstitutionally was directed only at Officer Pham, meaning only he will remain in the case as a Defendant with respect to Johnson's § 1983 excessive-force claim.

against Officer Pham because—and only because—Officer Pham handled her purse during the stop.  Johnson did not testify that she observed Officer Pham take the bill.  Her theory is that the claim is trial-worthy because "[t]he squad video shows Officer Pham recovering [her] purse from the Dodge Durango and he admitted going through her purse to locate her driver's license."  Pls.' Mem. in Opp'n at 15.

This Fourth Amendment theory is not legally viable here because the Eighth Circuit in *Ali v. Ramsdell*, 423 F.3d 810 (8th Cir. 2005) interpreted Supreme Court precedent—*Hudson v. Palmer*, 468 U.S. 517 (1984)—to hold "that a Fourth Amendment property claim against state officials is barred by the availability of an adequate remedy under state law."  *Ali*, 423 F.3d at 814.  In *Ali*, the plaintiff alleged that an officer (Ramsdell) seized $4,920 during a warrant-authorized search of her home "and converted the money to his own use."  *Id.* at 811–12.  In *Hudson*, the Supreme Court held unanimously "that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available."  468 U.S. at 533.  The Eighth Circuit, however, understood *Hudson* to go further, explaining:

> The unanimous holding in Part II–B of *Hudson*'s majority opinion was limited to procedural due process claims because four Justices would not join a holding that would apply "to conduct that violates a substantive constitutional right." 468 U.S. at 541 n. 4 (Stevens, J., concurring in part).  However, the five other Justices clearly thought the principle should apply more broadly.  Part III of the majority opinion declared: "We hold also that, even if petitioner intentionally destroyed respondent's personal property . . . the destruction did not violate *the Fourteenth Amendment* since the Commonwealth of Virginia has provided respondent an adequate

> postdeprivation remedy."  468 U.S. at 536 (emphasis added).
> Justice O'Connor's concurring opinion was even more
> explicit: "in challenging a property deprivation [under the
> Fourth Amendment or the Due Process Clause], the claimant
> must either avail himself of the remedies guaranteed by state
> law or prove that the available remedies are inadequate."  468
> U.S. at 539.

*Ali*, 423 F.3d at 814 (some citations omitted).  On this broader reading of *Hudson*, the

Eighth Circuit concluded that Ali's claim "that Ramsdell violated her Fourth Amendment

rights because he exceeded the scope of the search warrant when he seized and pocketed

some of her money" should have been dismissed on the merits.  *Ali*, 423 F.3d at 814–15.

Here, Johnson asserts functionally the same claim asserted in *Ali*.  She claims

essentially that, if the *Terry* stop was proper, then Officer Pham exceeded the permissible

scope of that stop when he seized and pocketed the $100 bill.  Neither Johnson nor Officer

Pham address *Ali*, meaning Johnson has not tried to show that the remedies available under

Minnesota law are not adequate.  For these reasons, and based on *Ali*, summary judgment

will be entered against Johnson's §1983 Fourth Amendment claim arising from the theft

of the $100 bill.

V

Johnson's conversion claim also is based on her allegation that Officer Pham took

the $100 bill from her purse and converted it to his own use.  Under Minnesota law, "'[t]he

elements of common law conversion are (1) the plaintiff has a property interest and (2) the

defendant deprives the plaintiff of that interest.'"  *Noble Sys. Corp. v. Alorica Cent., LLC*,

543 F.3d 978, 986 (8th Cir. 2008) (quoting *Olson v. Moorhead Country Club*, 568 N.W.2d

871, 872 (Minn. Ct. App. 1997) (internal quotation omitted)); *see DLH, Inc. v. Russ*, 566

N.W.2d 60, 71 (Minn. 1997) (defining conversion "as an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession'" (quoting *Larson v. Archer–Daniels–Midland Co.*, 226 Minn. 315, 32 N.W.2d 649, 650 (1948))).  Johnson claims that the Metropolitan Council, as Officer Pham's employer, is liable for his conversion on a respondeat superior theory.

As briefed, the primary issue is whether a reasonable jury could find that Officer Pham removed the $100 bill from Johnson's purse.  *See* Defs.' Mem. in Supp. at 32–33; Pls.' Mem. in Opp'n at 20.  I conclude that Johnson's conversion claim is trial-worthy, though barely so.  Johnson's theory is straightforward: the $100 bill was in her purse before the stop; Officer Pham was the only one who handled her purse during the stop; the $100 bill was missing immediately after the stop.  Though Johnson suggests that video evidence supports this claim, it is more accurate to say that the video evidence undermines but does not negate the claim.  The squad cars' cameras recorded Officer Pham's every movement throughout most of the time he handled Johnson's purse.  None of that footage would give a reasonable person any good reason to find that Officer Pham took the $100 bill.  He handles the purse in plain view, and the video shows that his hands remain empty except for the purse.  Worden Vid. Front at 17:07:23–39, 17:10:49–11:22; Eshenaur Vid. Front at 17:07:23–39, 17:10:49–11:22.  There are stretches, however, when Officer Pham had possession of the purse that were not captured by the squad cars' cameras.  Officer Pham denies taking the $100 bill and points out that the record includes no testimony from any witness who claims to have seen him take the $100 bill.  This fair contention is not enough

to keep the claim from trial, however. Johnson may not have a "smoking gun," but her theory is neither speculative nor conjectural.

The record, however, includes no information that might permit the Metropolitan Council to be held liable on a respondeat superior theory with respect to this claim. *See Loe v. Landis*, No. A22-0925, 2023 WL 2359454, at *2 (Minn. Ct. App. Mar. 6, 2023) ("'[T]o survive summary judgment on a claim that an employer is liable for an employee's intentional tort under the doctrine of respondeat superior, the plaintiff must present sufficient evidence to raise an issue of fact with respect to the foreseeability of such misconduct by the employee.'" (quoting *Frieler v. Carlson Mktg. Group, Inc.*, 751 N.W.2d 558, 584 (Minn. 2008))).

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' summary-judgment motion [ECF No. 11] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.     The motion for summary judgment as to all claims brought by Plaintiff Tammy A. Mhanna is **GRANTED**.

2.     The motion for summary judgment as to all claims against Officer Matt Wilkinson, Officer Peter Eshenaur, Sergeant Chad Worden, and the Metropolitan Council is **GRANTED**.

3.     The motion for summary judgment as to Counts 2, 3, 4, and 5, alleging now-abandoned state tort claims, is **GRANTED**.

4.      The motion for summary judgment as to Count 1, alleging claims under 42 U.S.C. § 1983, is **DENIED** insofar as Count 1 is brought against Officer Liam Pham and challenges the duration of Plaintiff Theresa L. Johnson's handcuffing as described above. The motion for summary judgment as to Count 1 is in all other respects **GRANTED**.

5.      The motion for summary judgment as to Count 6, alleging a conversion claim under Minnesota law, is **DENIED** insofar as Count 6 is brought against Officer Liam Pham.

Dated: May 1, 2023                                       s/ Eric C. Tostrud
                                                        Eric C. Tostrud
                                                        United States District Court